STATE of Missouri, Respondent,

v.

Roland John AUBUCHON, Appellant.

No. 49909.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1964.

Thomas F. Eagleton, Atty. Gen., Jefferson City, William L. Hungate, Spec. Asst. Atty. Gen., Troy, for respondent.

Stephen W. Skrainka, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for appellant.

EAGER, Judge.

Defendant was found guilty by a jury of first degree robbery by means of a dangerous and deadly weapon; upon a finding by the Court of five prior felony convictions he was sentenced to a term of forty years' imprisonment, after the Court

had first considered and overruled a rather exhaustive motion for a new trial. This defendant was jointly indicted with one Charles Cochran, but a severance was granted. The defendant was represented at the trial and is represented on this appeal by most assiduous appointed counsel.

In substance, the evidence disclosed the following facts: the filling station of Sweeney and Son at North Broadway and East DeSoto in St. Louis was robbed of approximately $147.88 at about 7:00 p. m. on April 7, 1962. The exterior of the station was well lighted at the time. The lone attendant, Wayne Love, was outside working on his car when a man (later identified by Love as Charles Cochran) approached him from the rear of the station, pointed a revolver at him, and ordered him inside. When Love had gotten inside, this man took the money in his coveralls, ordered him to unlock the "back room," pushed him in there and took the money from the cash box; when all this was completed, the man backed out and slammed the back room door. · As Love opened the door to go into the back room he had seen a man standing outside the station, "just standing," with a scarf wrapped around his head; Love thought this man was "facing in" the station. About 15 or 20 seconds after the inside man slammed the door, Love heard running, the words "Halt. Stop," and two shots. After about 35–40 seconds he opened the door and called the police. Love did not identify the man who was outside the station. He was sufficiently acquainted with defendant Aubuchon to speak to him. He identified the revolver produced as an exhibit as the same one or similar to the one used by the man who robbed him.

Patrolman Albert Lancaster and Major Joseph J. Gallagher of the St. Louis Police Department, not in uniform and driving an unmarked car, pulled into the filling station at the time of the holdup because the car which Love had been working on resembled one reported in a robbery. Lancaster testified: that he saw a man standing at the south end of the station looking in the window; this man had on a gray mackinaw or car coat and a scarf over his head; Lancaster jumped out on the passenger's side, started toward the man saying "halt, police officers"; the man was then facing the officers, he looked straight at Lancaster from a distance of about 25–35 feet, and the officer saw the man's face; thereupon the man pulled his coat collar over his head, turned, and ran down an incline back (east) of the station to Bulwer Street, thence south on Bulwer, with Lancaster in pursuit; Lancaster also testified that the man turned his head as he started down the incline, apparently to see if he was being followed. At this time Lancaster was almost close enough to grab him. Lancaster continued the pursuit on Bulwer to East Prairie, thence east to an alley and down the alley to Gano, where the man made a right turn and he lost him. During the first part of this pursuit Lancaster fired one warning shot. Major Gallagher, in the meantime, had tried to follow in the car and he picked up Lancaster, who immediately broadcast a description of the man and a request for a pickup; very shortly thereafter they met Officer O'Hearn about two blocks away, with a man in custody whom Lancaster promptly identified as the man he had pursued; this man was dressed in the same manner (except for the scarf). Lancaster positively identified defendant at the trial as the man whom he had thus pursued. This witness was cross-examined at some length from notes which defendant's counsel had made at the time of an interview; the notes had been very promptly transcribed. Lancaster had made the police report and he had also given a statement to the warrant office; one or both of these had been signed by him.

Major Gallagher saw a man moving around the southwest (front) corner of the station, moving toward the rear; this man ran through the back lot and Lancaster chased him. Gallagher had gotten out of the car after he stopped, but he did not see this man's face; he saw a scarf "across the top of his head and down the back of his

head".; Gallagher re-entered his car when the chase began, followed as best he could on the streets, and soon located Lancaster; he confirmed the latter's statement about finding defendant in the custody of Officer O'Hearn. Officer O'Hearn testified that he heard the broadcast description while cruising the neighborhood, that within one to two minutes thereafter he saw a man running across East Grand just east of Broadway (about two blocks from where Lancaster lost his man) and arrested him in a parking lot; that this man was breathing heavily, was perspiring, and appeared tired; he was wearing a gray car coat and work pants, with nothing on his head. This officer identified the defendant as the man whom he had thus arrested.

Officer Edward Mitchell arrested Charles Cochran (the joint indictee) at 11:00 p. m. on the next evening after this robbery, at his mother's home. The mother gave the housekey to Mr. Mayfield, a parole officer, and they entered. They found Cochran lying on the floor with a loaded .32 caliber pistol in his right hand. Mitchell stepped on his hand and disarmed him. The revolver offered and received in evidence was identified by Mitchell as the one he took from Cochran. Mitchell had gone there on call to assist other officers and he met them and Cochran's mother standing on the street. This officer testified that Mrs. Cochran was afraid of her son. All of this evidence went in without objection.

Anna Mae Gore, a sister of Charles Cochran, testified: that defendant and Cochran and two others were at her place early in the afternoon of April 7, 1962, but left between 2:00 and 3:00 p. m. She then lived at 121 East Grand, alone; this address was in the general vicinity of Sweeney's filling station, perhaps four or five blocks away. She had known defendant for about twenty years; her brother Charles had been staying sometimes at her home and sometimes at his mother's. On the same afternoon at about 4:00 or 4:30 defendant, Charles Cochran, one Mandino and Skip Hayes were there; all had a drink, and this present defendant (whom she called Junie) "displayed a gun" which was either the same one or similar to the one introduced as an exhibit; he merely showed it and then put it back in his pocket. At around 5:30 or 6:00 o'clock all four left, but they soon returned; thereafter Aubuchon, the present defendant, took the revolver out of his pocket and handed it to Charles Cochran who asked him where the shells were; defendant then gave Cochran some shells and the latter "loaded the gun" and kept it, putting it in his pocket. In about twenty minutes thereafter and at about "dusk" Cochran and Aubuchon left, but before leaving the defendant said,— "let's go up to Sweeny's and get Sweeny's" that Wayne was working up there, and that "they kept quite a bit of cash on Saturday evenings." That her brother said "Okay"; that defendant Aubuchon borrowed a scarf from her and "they" told her to stay there, that they were "on foot" and they wanted a place to go; that they went out through the alley toward Bulwer Street; that defendant was dressed in a dark gray car coat and tan trousers. On cross-examination of this witness the following was developed: that she had appeared without subpoena, but at the request of the Circuit Attorney; that about three years previously another brother, James LeRoy Cochran, was tried twice in the federal court for the robbery of the Roosevelt Savings Bank; that she was not present at his first trial; that she heard that defendant Aubuchon had testified in one of these trials; that she did not know what had caused that brother's arrest. She stated, volunteering an answer to a remark of defense counsel, that she did not "suspect the defendant is the informer." She admitted that she had called defendant'. mother at 2:00 a. m. within the past week and had talked about "this" (present) trial; that the stated purpose of the men in transferring the pistol was "to go get some money"; when asked if she would be happy to see defendant up in jail she replied: "Well, when we do these things, we must be punished for it, whether it's me, you, or

whoever it is. It doesn't make me happy to see anyone go in jail, and —." On re-direct, the following occurred: "Q Where is your brother, Charles Cochran? A Jefferson City, Missouri. Q In the peni-tentiary? A Yes. MR. SKRAINKA: Objection, Your Honor. That's not in this case. MR. KOSTER: Well, I would like to ask a couple more questions, Judge. THE COURT: Maybe he will connect it up. I will hold a qualified ruling on that objec-tion, Mr. Skrainka. Go ahead." It was further developed at that time, without objection, that James LeRoy Cochran had also been tried in the state court about six months to one year previously for armed robbery and sentenced to ten years' impris-onment; and, finally, that the witness had been sometimes known as Mrs. Hayes, but she was not married to Hayes.

The fact of defendant's prior convictions, the service of sentences, and his discharges from imprisonment were stipulated. The defendant did not testify. On his behalf the following evidence was developed: that he had worked three days immediately pre-ceding the day of the robbery at a venetian blind plant, and that his wife had later picked up his check; that a brother of his mother had recently offered to give him work on his farm near Annapolis, Missouri, or possibly get him work at a sawmill and furnish him and his "wife and kids" a home on the farm. Thomas Crowell, who had lived in the same building with defendant for three or four weeks before April 7, 1962, and had been defendant's landlord, testified: that on the afternoon of April 7, 1962, defendant and his wife and two friends of defendant were in his living room; that they had two or three beers and that defend-ant's wife said they needed milk for the baby and that defendant left to get the milk; that this was about 2:30-3:00 p. m.; that defendant had two children. The Court, on objection, refused to let the witness state the ages of the children. Crowell's wife corroborated the fact that defendant left, supposedly to get milk. Eugene Paul Hayes testified: that he lived with Anna Mae Gore for three weeks and that a group, including himself and her, shot themselves with "Valoinhaler,"—"We all shot the stuff at Junie's house" and he (defendant) used it; that the witness was in the workhouse on April 7, 1962, for stealing cigarettes and shoplifting; that he had also been convicted of burglary, larceny and "strong-arm robbery," and had served penitentiary sentences both in Mis-souri and Texas; that he had practically grown up with defendant and Charles Coch-ran. All of the foregoing testimony went in without objection.

Defendant's mother testified: that she operated a restaurant on the corner of East Grand and Broadway, and lived up-stairs with her husband; that she owned the restaurant, and that defendant (who was 31 years old) had worked for her "off and on" but "steady" for about two years, except for the three days before his arrest; that she did not pay him in money, but he got from her all or most of the food and milk for his family, that she gave him money for clothes for the children and for spending money, and "paid on his rent, gas and electric bills,—most of his bills"; that her restaurant was not open on Saturdays or Sundays but that she would leave the key where he could find it; that she had testified at both federal court trials of "LeRoy" Cochran, under subpoena, and that later another Cochran brother looked for her and her son (defendant) with a shotgun; she denied sending a man to persuade Anna Mae Gore not to testify in the present trial, but stated that Anna Mae had said that "she would get even with us some way." On recross-examination of this witness it was developed over objection that defendant was not married to the woman he was living with. Defense counsel then put this young woman, Janice Eckenfels, on the stand, and she testified that she was 19 years old, that she had lived with defendant for four and one-half years, and had two children by him, one of whom was one year old, the other soon to be four; that she had been married to one Eckenfels who received

a life sentence to the penitentiary about one month after their marriage; that she had used the name Aubuchon and was so registered for Social Security, she being employed. She corroborated the fact that during the afternoon of April 7, 1962, she sent defendant from the Crowells to get milk, around 3:30 or 4:00 o'clock.

We may find it necessary to refer to further details of the evidence in considering defendant's points and argument, but this lengthy discussion will suffice for the present.

■ Defendant's first point is that the Court erred in not requiring the State, on motion, to advance the costs of sundry depositions which he wished to take. A defendant is, of course, permitted to take depositions under the authority of § 545.400 (all statutory references are to RSMo 1959 and V.A.M.S.) and Criminal Rule 25.10, to be used conditionally. These provide, essentially, that the depositions shall be taken as provided in civil actions, but they make no reference to costs. The motion listed the names of eight witnesses and asked that the costs of all such depositions be "paid by the state." The motion was filed six days before the trial. In substance, defendant's contention is that his counsel could not get any reporter or notary public to take the depositions unless the cost thereof was *advanced,* and that the indigent defendant could not do so, hence the only practical method was the advancement of the costs by the State. These witnesses had all been listed as State's witnesses. We note here that § 550.040 provides that (in criminal cases of this class) *if the defendant is acquitted* the costs shall be paid by the State; we note also, § 550.050, that if the defendant is *convicted* and is unable to pay the costs the county shall pay all the costs, *except such as were incurred on the part of the defendant.* The latter provision has long been a part of our statutory law, it constitutes a clear injunction that no costs incurred on behalf of a defendant, indigent or not, are to be paid by the county, and

nowhere is any obligation laid upon the State. The whole matter of costs in criminal cases is statutory.

Both in the motion and here counsel has raised the question that the failure thus to furnish defendant with free depositions constituted a violation of various constitutional rights, including due process, the administration of right and justice (Art. 1, § 14, Mo.), the right to defend one's self (Art. 1, § 18(a), Mo.), and a denial of equal protection. The trial court, in denying the motion, expressly held that no such rights were violated and that there was no statutory authority for an order requiring payment by the State, conceding that the taking of depositions was authorized.

■ The taking of depositions at all, civil or criminal, is a privilege granted by the State and upon such terms as the State may fix. Counsel seeks to analogize this supposed right to the rights of indigents to appointed counsel and to free transcripts to be filed without docket fee. We see no true analogy. Such requests as the present one could be expanded almost indefinitely,—to include expert witnesses in many fields, paid investigators, chemists, etc. The State of Missouri has done much over the years in furnishing an adequate defense to indigents in felony cases; more may remain to be done, but the legislature has certainly not provided for the payment or advancement of the cost of defendant's depositions and the courts have no authority to order any such payment. We do not find the various cited federal cases, treatises, law review articles, committee reports, excerpts from speeches or cases from other states either controlling or particularly persuasive. The Missouri cases cited are generally not in point; however, in the case of State v. Chapman, Mo., 365 S.W.2d 551, where defendant sought a physical examination at the expense of the State, the Court said, loc. cit. 552–553: "'A request by accused [when incarcerated] that he be permitted to undergo a physical examination so it may be used as evidence at the trial is

addressed to the sound discretion of the court, and in the exercise of discretion such an examination may be permitted or denied.' * * * However, in none of these cases was the requested physical examination to have been at the expense of the State. The right of the defendant to an examination by a specialist at the expense of the State would depend upon either a statute or rule granting such right or that it was essential to due process of law. We have no such statute or rule in this State, and such an examination at the expense of the State, at least under the circumstances shown in this case, certainly is not essential to the minimum requirements of due process under either the Missouri or United States Constitution." Many of the federal cases cited concern failures to furnish indigents with appointed counsel or with sufficiently complete transcripts. We have no such questions here. Counsel's attempted constructions of other Missouri statutes in such manner as to alter the plain meaning and legislative intent evidenced in those we have cited are unsound. We hold there is no statute or rule of court in Missouri which fairly requires or authorizes the State to pay for (except upon acquittal) or to advance the costs of depositions taken or desired by a defendant. We further hold that neither the failure to so provide nor the failure of the Court to so order is a violation of any constitutional rights of defendant, federal or state. As a corollary to the foregoing and not as a ground for the ruling, we note that defendant could have taken freely the depositions of any and all desired witnesses upon written interrogatories.

We have discussed the foregoing point and discuss the next one because both would, in all probability, be controverted upon a remand if not determined here. The second point is that the Court erred in not requiring the production of the police report made by Officer Lancaster and also a statement which he had made to the "warrant office." Counsel claims that in this, also, defendant's constitutional rights were violated,—the right of confrontation, due process, and the right to compulsory process under Art. 1, § 18(a) of the Missouri Constitution. This contention was developed during the trial in colloquies between the Court and counsel, and also upon questions to the Assistant Circuit Attorney out of the presence of the jury, it being considered that he was sworn and was testifying. Subpoenas duces tecum had been issued for these documents, and in actual effect, the matter was ruled as though upon a motion to quash the subpoenas; the Court declined to enforce them and sustained objections to the production of the documents. As already stated, this point only involved prior written statements made by Officer Lancaster. That witness had been produced by the Circuit Attorney's Office for an interview with defendant's appointed counsel, and as the latter talked with the witness he made notes which were promptly transcribed. These notes were used by counsel in the cross-examination. The documents sought were not produced or used during the trial by counsel or by any witness for refreshing his recollection or otherwise.

Counsel cites a great number of federal authorities and cases from other states, apparently to show that our prior Missouri cases on the subject are unsound. We are not persuaded that they are. There is no general right of discovery by statute or rule in Missouri in criminal cases. We have considered similar matters in: State v. Crayton, Mo., 354 S.W.2d 834; State v. Cochran, Mo., 366 S.W.2d 360; State v. Hinojosa, Mo., 242 S.W.2d 1; State v. Gilliam, Mo., 351 S.W.2d 723; State v. Redding, Mo., 357 S.W.2d 103; State v. Simon, Banc, Mo., 375 S.W.2d 102; State ex rel. Page v. Terte, Banc, 324 Mo. 925, 25 S.W. 2d 459; State ex rel. Phelps v. McQueen, Banc, Mo., 296 S.W.2d 85. Some of these cases involved production before trial, others production at trial for the supposed purpose of impeachment. Counsel says that it makes a difference here that the papers desired were under subpoena, whereas in some of the cited cases they were not. We

note also that in some they were. It is true that a subpoena may and usually does result in a production of the paper in court, but it does not alter the basic admissibility or right of inspection when the question is properly raised. Generally, we have held that the defendant's counsel should be permitted to inspect any report or paper which a witness has referred to or used on the stand to refresh his recollection. Crayton, supra, and cases there cited and discussed; Simon, supra. We have also held very specifically that there should be a showing of the probable materiality of the paper, Crayton, Simon, Hinojosa, Gilliam, and that a mere fishing expedition is not to be permitted "upon the possibility of impeachment" or for prying into an adversary's case. Simon, supra, and other cases just cited. The propriety of requiring the production for the defendant of documents such as prior reports and written statements of a witness in the hands of the State, is in the first instance, a matter resting largely in the discretion of the trial court. As already stated, there is no general right of discovery in criminal cases in Missouri. Documents such as those sought here are written as a part of the initial preparation of the State, in contemplation of a prosecution. Whether expressly so made by statute or rule or not, there remains in them inherently an element of work product, and perhaps of privilege. The State is not permitted in any possible way to discover facts from a defendant; we are unwilling to open up, carte blanche, the files of the State to a defendant. We have reached that point in our criminal jurisprudence where we should consider, and balance, the rights of the public against some of the recently pressed rights of the defendants. We hold now that, if there is a satisfactory showing that a report or statement of a witness in the hands of the State is of such nature that *without it,* the defendant's trial would be fundamentally unfair, then it should be produced; otherwise not. And this decision rests, in the first instance, in the discretion of the trial court; we may later consider, if and when necessary, an abuse of that discretion. If the trial court wishes to examine the document before ruling, it may do so.

■ Looking again at the record in this case, there was no such abuse. Defendant's counsel had interviewed Officer Lancaster at length and had cross-examined him from the transcribed notes of that interview and from a sketch which was made at that time. From the context of the cross-examination and from counsel's expressed reasons for wanting the papers, it is obvious that all he *hoped* to show thereby was, in substance, that the witness had previously made somewhat different statements concerning: the precise point at which he had lost the defendant in his chase (resulting from Lancaster's unfamiliarity with the street names which he admitted at the trial); whether defendant was actually looking in the filling station window when he first saw him, or merely standing at the southwest corner near the window; whether defendant had pulled up his jacket collar when Lancaster approached; and whether defendant had glanced back as he ran down the incline. There was not even an inference that Lancaster had not at all times positively identified the defendant as the man he had seen and chased. This witness testified very frankly and freely, and counsel conceded that his testimony was "generally truthful." The matters just recited are *details* and they concern nothing fundamental to the defense. Moreover, there has been no showing that even on these details the documents would impeach the witness' testimony. Lancaster admitted certain minor discrepancies between his statements (and sketch) at the interview and his testimony at this trial. Under these circumstances, there was no abuse of discretion in refusing to require the production of the documents.

■ It is impossible to discuss all the authorities and texts cited on this point by defendant's counsel. The rule in some other states many differ, but generally much is left to the discretion of the trial judge.

Reference has often been made to the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. So far as we are concerned, we agree with the Supreme Court of Indiana when it said in Anderson v. State, 239 Ind. 372, 156 N.E.2d 384, 385 (as partially quoted in Simon, supra): "We do not question the right of the United States Supreme Court to establish rules of practice and procedure for the federal courts. However, we are neither responsible for nor bound by such rules. We are only responsible for and bound by the rules of practice and procedure as established in the state of Indiana, and so long as they guarantee to every citizen his constitutional rights no federal question is involved. The rule which appellant asks us to adopt does not involve any constitutional question. The action is not required by any statute or rule of law known to this jurisdiction. The adoption of such a rule would constitute a serious departure from the rules of judicial procedure which have, for centuries, protected both the interests of society and the rights of its individual members who may have defied its laws." It has been conceded generally that the Jencks case merely involved the right of supervision of the federal courts, and not a question of due process. And that matter has since been regulated by Congressional action. U.S.C.A. Title 18, § 3500. No constitutional rights of the present defendant were violated when the court declined to order the production of the police report and the statement. Situations may well be conceived where the production of statements, reports and perhaps other documents or exhibits should be required in order to make the trial fundamentally fair, balancing this with the public interest. Thus, if it be fairly shown that a material prosecuting witness had previously made a statement of facts which completely exonerated the defendant, or which would totally change the degree of a crime, this should be produced. We do not foreclose such cases. We merely rule this one, reaffirm our previous cases, and perhaps clear up the rulings to some extent.

We consider next defendant's point 5. When Anna Mae Gore was on the stand for re-direct examination, the State brought out the fact that her brother Charles Cochran, defendant's co-indictee, was in the penitentiary in Jefferson City. The jury had been advised from the beginning of the case that Cochran and Aubuchon had been charged jointly with this robbery. The clear implication from this evidence was that Cochran had been sentenced for his part in this particular robbery. While the objection to the answer is shown in the record as coming immediately after the answer was completed, we recognize the difficulty at times of getting in a timely objection to a question and answer such as this; after the State's counsel first asked where the witness' brother was, and received the answer "Jefferson City" this followed: "In the penitentiary? A Yes." There is a fair inference that the answer followed too quickly for an objection. The court withheld its ruling on the objection while permitting further questions, but essentially the objection was overruled and the evidence remained. If it be necessary here, which we doubt, we may and do invoke the rule of plain error. Rule 27.20(c). This point has been fully preserved in the motion for a new trial and since. We are unwilling to rule it upon a technicality. The Assistant Circuit Attorney magnified this error, substantially, by stating in his final argument that "Cochran is in the penitentiary," as were others of his friends, and that defendant was the only one "of the whole bunch still on the street." We mention this argument as merely emphasizing the prejudicial effect of the evidence, since no objection was made to the final argument at the time.

We have held that it is error to show in evidence or to tell the jury that a jointly accused defendant has been convicted or has pleaded guilty. State v. Mull, 318 Mo. 647, 300 S.W. 511; State v. Stetson, Mo., 222 S.W. 425; State v. Castino, Mo., 264 S.W.2d 372; and see 2 Wharton Cr.Evi. (12th Ed.) § 439, p. 215. So, also, have we held that evidence of the acquittal of one

jointly accused is improper. State v. Recke, 311 Mo. 581, 278 S.W. 995, 1000; State v. Brown, 360 Mo. 104, 227 S.W.2d 646, 653. Were this not the law, the value of a defendant's right to a separate trial under § 545.880 and Rule 25.07 might be considerably dissipated. The theory of our statute abolishing the distinction between principals and accessories, § 556.170, is that every defendant who joins in the commission of a crime is liable, *on his own*, as a principal; but he is also entitled to be tried on his own without having his guilt prejudged by what has happened to his co-defendant. This statute has obviated the old rule under which it was proper and perhaps necessary to show the conviction of the principal before an accessory could be convicted. 2 Wharton Cr.Evi., supra. The State seeks to justify the admission of this evidence on the "framework" of other evidence, apparently meaning that defense counsel had shown on cross-examination that another brother had been convicted of robbery, and that the witness herself had been living, unmarried, with one Hayes. It is true that many unsavory factors were developed in connection with persons directly or indirectly involved; that, however, cannot justify the State in putting in additional poison by way of inadmissible evidence. The argument that this evidence was material because it tended to show that Anna Mae Gore could no longer be seeking leniency for her brother, is too thin to outweigh the prejudicial effect of the evidence. We are convinced that the evidence was improper; we have given considerable thought to its prejudicial effect,— in the light of the background of the defendant himself, and also in view of the fact that the evidence fairly showed that a robbery had been committed by one identified as Cochran, while the guilt of defendant depended upon proof of his aiding and abetting; in other words, that their respective convictions would depend on somewhat differing facts and proof. We have been unable to find, however, that the evidence was harmless and we rule it prejudicial. The case will be reversed for this reason.

 The other points involve alleged errors in the giving and refusal of instructions, in the admission and exclusion of evidence, and in connection with the final argument; it may be that none of these matters will occur upon another trial. We shall not add to this opinion by considering them, except to remark on Points 3 and 4, that the Court was not required, either on the "unique facts of this case" or otherwise, to give an instruction withdrawing any "adverse inference" supposedly arising by reason of defendant's failure to testify, nor was it required to instruct upon the theory that defendant was an "accessory before the fact." As to any other alleged errors, the State may consider the brief filed here and the objections made, and govern itself accordingly.

For the reasons assigned, the judgment is reversed and the cause remanded.

All of the Judges concur.