**STATE of Missouri, Respondent,**

v.

*Willie MORRIS, Appellant.*

No. 55047.

Supreme Court of Missouri,
En Banc.

May 8, 1972.

Rehearing Denied June 13, 1972.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

David B. Lichtenstein, Donald K. Gerard, Clayton, for appellant.

HOLMAN, Judge.

Defendant, Willie Morris, was charged with the offense of murder in the second degree. Upon trial he was found guilty and his punishment was fixed by the jury at imprisonment for a term of 20 years. See §§ 559.020 and 559.030.[1] Defendant has appealed.

This appeal was originally heard in Division One where an opinion was adopted, but the case was subsequently transferred to Court en Banc because of the dissent of one of the judges. After the case was reargued the Division opinion failed of adoption en Banc and the cause was assigned to the undersigned. Portions of the aforementioned opinion are here adopted without the use of quotation marks.

This case grew out of events that occurred at a tavern called Little Caesar's Lounge in the City of St. Louis. On September 3, 1968, about 11:30 p. m., there was an altercation between one Richard Wair on the one hand, and defendant, his brother, and at least one other companion on the other hand. There was wrestling among the participants, or wrestling plus the striking of some blows, depending on whose testimony is accepted. During the altercation, or shortly thereafter, a shot was fired and Terrell Moss, who had not been involved, was hit and killed.

No witness gave testimony tending to prove that the gun firing the fatal shot was in the possession of the defendant at the time, other than William Butler who testified for the State, and the defendant who testified in his own defense.

In order to enter or leave the tavern it was necessary to go through two passageways, the "outer door" and the "inner door," with a distance of about three feet between the two doors. Butler's testimony, together with the inferences most favorable to the State, was as follows: As he was tending bar, he became aware that there was a fight on at the end of the bar near the inner doorway. Defendant and a number of others were fighting Mr. Wair, and got him down on the floor and were kicking him. Mr. Butler came around the bar, pulled Wair's assailants off him and forced them outside the tavern, keeping Wair inside. Those who had been ejected went toward a car. A minute or two later Butler, while standing in the inner door holding that door open, saw defendant through a window alongside the outer door as the defendant approached the tavern. Mr. Moss then came alongside Butler from inside the tavern and touched Butler on the shoulder. At the same instant defendant opened the outer door, pointed a pistol and the pistol fired. He pulled the trigger

again but the gun only "clicked." Mr. Moss fell to the floor and defendant fled the scene. The jury was instructed that if they found that defendant intended to shoot Butler but hit Moss instead, and found all of the elements of second degree murder set out in the instructions, they could convict defendant of second degree murder.

■ The State's evidence was sufficient to authorize the jury to make a finding of second degree murder; and defendant's contention on appeal that no submissible case was made is without merit. State v. Williams, Mo.Sup., 323 S.W.2d 811; State v. Anderson, Mo.Sup., 375 S.W.2d 116; State v. Strong, Mo.Sup., 339 S.W.2d 759.

Defendant's testimony was that after the fight with Mr. Wair started, Mr. Butler pulled defendant off Wair who was then on the floor. He stated that as Wair was getting up off the floor he "went to his pocket." Defendant then pulled a gun from his own pocket intending to protect himself in case Wair pulled something out of his pocket. However, defendant did not get a chance to see Wair take his hand out of his pocket. Butler, holding defendant by the collar with one hand and by his arm with the other hand, pushed defendant against a door or wall, striking defendant's head. At that point the gun fired. Defendant does not know which direction the gun was pointed at that time. He testified that he did not know that anyone had been hit, and that he left the scene because he heard someone say, "Get him," and he was frightened. He testified that all the events leading up to and including the firing of the gun occurred inside the tavern, and denied that he left the tavern, or was ejected from the tavern, before the time when his gun was fired.

■■ Defendant contends that the trial court erred in failing to instruct on self-defense. But defendant's testimony was that the gun was fired accidentally, and the defense of excusable homicide by reason of accident was submitted to the jury. The concepts of self-defense and accidental

homicide are inconsistent. State v. Baker, Mo.Sup., 277 S.W.2d 627; State v. Hale, Mo.Sup., 371 S.W.2d 249, 258. The evidence to justify an instruction on the inconsistent defense must be offered by the State or proved by third-party witnesses for the defendant. State v. Baker, supra, 277 S.W.2d 1. c. 630. Outside of the testimony of defendant, no witness gave testimony tending to support either the submission of self-defense or accidental homicide. This point is ruled against defendant.

■ There is also no merit in the contention that the court erred in allowing Joseph Brasser to testify as an expert in the field of ballistics because he was not shown to be adequately qualified. It is difficult to understand this contention since it was shown that the witness had made more than 10,000 examinations in that area over a period of four years. Moreover, his testimony was of little consequence. He examined the bullet taken from the body of deceased and the shell casing found on the sidewalk outside the lounge. Since the defendant's gun was not available he could not make any test to show whether the bullet was fired from that gun. His conclusion simply was that the bullet *could* have come from that kind of shell casing but that he could not say that the bullet in question did come from it. He was certainly shown to have sufficient qualifications to give that limited expert testimony.

■ The next point briefed is that defendant was denied due process because the State did not show him certain photographs taken by a police photographer which he says would have aided him in his defense. These photographs and certain other material have been lodged with this court, but since they were not referred to in the trial nor mentioned in the motion for new trial they are not before us for consideration, and contentions of error relating thereto are not preserved for appellate review.

■ After the shooting defendant and his two companions immediately left the scene in an automobile, but it was soon

disabled when he ran into a utility pole. They then ran about a mile to the home of his wife. He took the position at the trial that he fled because someone had said "get him" and that he was pursued until he got in his car. In that connection he made an offer to prove (to which the court sustained objection) that when he left his wife's home an hour or more after the shooting "he was shot at four times, one bullet striking his leg, by a person or persons unknown." He now contends that the court erred in excluding that testimony because it would tend to show that his departure from the scene was attributable to his fright and not to a consciousness of guilt. At the time of the proffer defendant's attorney stated, "I don't know who shot him. He doesn't know who shot him. It may be that some person from that bar shot him." Defendant cites the cases of State v. Craft, 344 Mo. 269, 126 S.W.2d 177, and State v. Burns, Mo. Sup., 322 S.W.2d 736, which state the general rule that the accused has the right to refute any incriminating circumstances relating to flight. We do not believe that rule would warrant the admission of the proffered evidence under consideration. It is our view that this evidence, if not entirely irrelevant, was at least not sufficiently connected with the events at the bar and was too remote to be admissible for the purpose suggested.

Defendant next contends that the trial court erred in refusing his request to see the police report concerning the investigation of this homicide and particularly that part relating to an alleged statement by witness Butler. The request arose in the following manner. During the trial defendant's attorney had before him a transcript of the testimony given at the coroner's inquest. In it Detective Hummert testified that he participated in the investigation of the homicide in question. He further testified as follows: "Q. How about giving Butler's statement then? A. William Butler who is a part-time bartender at Little Caesar's Lounge stated he was behind the bar when a fight began near the front door and on going to the front door, he broke up the fight which was between Willie Morris and another subject unknown to him at which time Morris, who had a gun in his right hand, fired same, the shot striking the victim Terrell Moss. After the shooting Morris and other patrons in the establishment ran out of the tavern on to the street and fled the scene."

On cross-examination of Butler, counsel for defendant laid a foundation for his impeachment as follows: "Q. You talked to the police later that night? A. Sure. Q. Did you tell them the same story you're telling us here today? A. That's right. Q. Did you talk to Detective Hummert? A. Hummert? Q. Hummert. Do you know Detective Hummert? A. Not as I know of. * * * Q. Did you tell Detective Hummert that after the shooting Morris and other patrons in the establishment ran out of the tavern on to the street and fled the scene? A. No, I don't know Detective Hummert. Q. Did you say that to a policeman? A. No, not as I know of, no. I didn't talk to but two." It appears from the transcript that the two officers who interviewed witnesses at the scene were Detectives Troupe and Roche and they both testified. Having laid a foundation therefor it would appear that counsel could have asked each of those witnesses if Butler had made the statement set out in the foundation question but he did not see fit to do so. When Officer Hummert testified he stated that he participated in the follow-up investigation but that he did not interview William Butler. On cross-examination counsel sought to impeach him by asking questions in regard to his testimony before the coroner's jury. Upon objection he was questioned outside the hearing of the jury. He then stated that his testimony in regard to a statement by Butler was entirely hearsay and that said testimony was his recollection of information obtained in discussions with officers who had interviewed him and from reading the police report. The court thereupon ruled that counsel could not ask Hummert, in the presence of the jury, if he had obtained the statement heretofore quoted from Butler.

Defendant does not complain of that particular ruling on this appeal. At this point counsel for defendant asked that he be permitted to see the police report so that he could determine whether the officer or Butler had made any inconsistent statement therein. The court ordered it produced so that it could screen it to determine whether it should be shown to defendant. The court thereafter ruled as follows:

"After reading the entire Exhibit Alpha consisting of thirteen pages, and especially the references to the statement or narrative of what the witness William Butler was alleged in such report to have said, the Court concludes and finds that such statements attributed to Butler are so intertwined and intermingled with other portions of the full report Alpha that it would be practically impossible to determine that the statements therein contained, and especially on page 4, were actually correct verbatim statements made by Butler and that the Court is at a loss to determine from the report exactly to whom such report and statement of Butler was made.

"The entire thirteen page document is in the form of a narrative and the Court finds that, as indicated in State v. Aubuchon [Mo.Sup], 381 S.W.2d 807, 814, such report here was written as a part of an initial preparation of the State in contemplation of a prosecution. Reserving the right to make any comments on the kind, character and nature of such reports, this Court finds that the rights of the defendant would not be prejudiced by denying to defendant's counsel the use of such purported report of a statement of William Butler as contained in the conglomerate supplementary report. * * The request will be overruled and denied."

After the appeal was taken this court ordered that the exhibit be made available to counsel for use in preparing their briefs. The report was prepared and signed by Captain Valenti who did not interview any witnesses but apparently used information furnished by other officers. The part relating to Butler's statement is as follows:

"While at the scene, the 6th District Officers interviewed the following named persons: WILLIAM BUTLER, Negro male, who stated that he works part time as a bartender at Little Caesar's Lounge, located at 4873 Natural Bridge. Continuing, William Butler stated that on Tuesday evening, September 3, 1968, he was tending bar, at which time there was a large crowd of people in the lounge. He stated that he observed two customers arguing near the front door, who then began to struggle with each other. He then left his place at the bar and attempted to push the two subjects out the front door, when some unknown person in the lounge said, 'Look out, he has a gun.' At this time there was a shot fired and the victim, who was standing next to him (Butler), fell forward and staggered out the door.

"William Butler further stated that the subject with the gun pointed the gun into the lounge and attempted to fire it, however, it did not go off and the subject ran from the doorway of the lounge. He also stated that the subject responsible for the shooting was one: WILLIE MORRIS, Negro male * * *."

■ It is our view that the trial court did not err in its ruling. The refusal of the court to permit inspection of the report by defendant did not cause defendant's trial to be fundamentally unfair and therefore neither State v. Aubuchon, Mo.Sup., 381 S.W. 2d 807, nor State v. Cannon, Mo.Sup., 465 S.W.2d 584, would require a different ruling. We do not think that the quoted portion of the report would have been of any benefit to defendant's counsel. This case, as well as Cannon, demonstrates that police reports are work products prepared largely upon hearsay information for the use of the police department and the prosecutor. In this instance, Butler's purported statement was written by an officer who had not interviewed him and it was a

composite summary of what interviewing officers of the Sixth District had related to him as to what Butler had said. It would not have been admissible in evidence under any circumstances. And it would have been of no more value to defendant's counsel in the cross-examination of Butler, or in seeking to impeach him by the cross-examination of the interviewing police officers, than was the statement in the transcript of the testimony before the coroner which counsel had available at all times.

After the trial court read the report it was a matter for the exercise of its discretion to determine whether it should be shown to defendant's counsel and we see no indication that the court abused that discretion. The situation here is analogous to that in State v. Cannon, supra, in which we held that the defendant was not prejudiced by the court's ruling in denying his request to examine the police report. We state again, as indicated in Cannon, that this court is now considering the adoption of rules relating to criminal discovery which may settle many questions in that area for future cases.

As indicated, we rule this contention against defendant.

■ Defendant further contends that Instruction No. 3 was prejudicially erroneous. This manslaughter instruction had the following introductory paragraph: "If you find the defendant not guilty of murder second degree as explained in the foregoing instruction, then you will consider whether or not, under the evidence in the case, the defendant is guilty of manslaughter. Manslaughter is the killing of a human being not herein declared to be murder in the first degree or excusable homicide." Thereafter, the instruction hypothesized the specific facts necessary for a finding of guilt. The error complained of is the reference to murder in the first degree in the manslaughter definition. First degree murder was not otherwise mentioned or defined in the case. We do not think that this inadvertent error confused the jury. If the definition had referred to murder without

specifying the degree it would have been correct. Moreover, the definition was not necessary and, since the jury was required to find every fact essential to the offense, we do not believe the error could be considered prejudicial. We accordingly rule that no prejudicial error occurred.

■ The next point briefed is that the court erred in failing to give an instruction on excusable homicide. We fail to understand this contention since the court gave the instruction on accident which was offered by defendant. This was the only theory of excusable homicide supported by the evidence. The point is disallowed.

The final contention relates to alleged error in Instruction No. 4, which was not mentioned in the motion for new trial. We are asked to review it under the "plain error" rule. Our consideration of the contention and the circumstances here involved has caused us to conclude that there is no occasion for us to review this contention under Rule 27.20(c), V.A.M.R.

The judgment is affirmed.

FINCH, C. J., DONNELLY and HENLEY, JJ., and WEIER, Special Judge, concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed, and concurs in separate dissenting opinion of BARDGETT, J.

MORGAN, J., not sitting.

SEILER, Judge (dissenting).

I respectfully dissent, because this defendant, in my judgment, has not had a fair trial in two respects: (1) he was not permitted to use the police reports to show that William Butler told a different story to the detectives than he did at the trial and (2) despite the trial court's order that the police reports be delivered to the court for determination whether there was a

prior inconsistent statement made by the witness Butler, this was not done, with the result that not until an order was issued by this court to produce the police reports for use of counsel in briefing the appeal did it come to light that the police had a complete statement of William Butler (according to their records), which was not produced at trial.

The testimony of William Butler was vital to the state's case. Had the defense been able to impeach Butler it could well have made the difference between conviction and acquittal of defendant, a recently returned Vietnam veteran, married, with three children and no prior convictions. If it had been proved Butler made the statements testified to by Detective Hummert at the coroner's inquest[1] or the statement contained in the police report, exhibit Alpha, the jury might reasonably have interpreted them to mean that all events, commencing with the fight and up to the firing of the gun, occurred in rapid succession and all occurred inside the tavern, that the gun fired while Butler was in the process of ejecting defendant and his companions, that defendant did not go to a car after he was ejected and return at a later time and fire the shot. It would have had a material bearing on the determination by the jury of the issues of whether defendant intentionally fired the fatal shot, the extent and degree of premedita-

tion, and whether the defendant's defense of accidental homicide should be accepted. The purported statements by Butler are more consistent, in many respects, with defendant's own testimony than is Butler's testimony at the trial.

In State v. Aubuchon (Mo.Sup.) 381 S.W.2d 807, 814, it is held that ". . . [I]f there is a satisfactory showing that a report or statement of a witness in the hands of the State is of such nature that *without it*, the defendant's trial would be fundamentally unfair, then it should be produced . . ." This principle is sufficient to justify the reversal and remand of the case at bar.

My convictions are strengthened by what happened on appeal. On March 5, 1970, Division One of this court sustained defendant's counsel's motion that the court obtain exhibits Alpha and Beta[2] and the remaining portions of the police report. Pursuant to that order, exhibits Alpha and Beta were filed here, along with a third document, now marked defendant's exhibit 7, which defense counsel stated was turned over to them by the circuit attorney's office.[3]

Exhibit 7 is a supplementary five-page police report. It is dated September 3, 1968, the date of the homicide, and sets forth in detail the investigation made by Detectives Troupe and Roche from the time

1. How important the state thought it was that Butler not be impeached is shown by what happened when the court was about to permit defense counsel to cross-examine Detective Hummert by reading the answer given by Hummert at the coroner's inquest. The answer set forth Butler's statement. The assistant circuit attorney argued that ". . . this is fatal as far as the State is concerned . . . ."

2. Exhibits Alpha and Beta were all that was produced in the trial court. At first only Alpha was produced. Defense counsel pointed out to the trial court that Alpha was dated seven days after the homicide and was designated as a "supplementary" report, which would indicate that there were prior reports. The state then produced Beta, but that was all.

3. The state does not challenge this assertion, although it is aware the exhibit has been on file here over a year and its representatives have participated in the two arguments before this court, in the course of which exhibit 7 was referred to several times. It also is mentioned in appellant's briefs.

In view of EC 7–13 of Canon 7 of our Code of Professional Responsibility, which declares that the duty of the prosecutor is ". . . to seek justice, not merely to convict . . .", and places on him the duty of making timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, I am confident the failure of the state to contend otherwise means we can safely assume that exhibit 7 is authentic.

they were first notified of the shooting until the early hours of the following day. On page three of exhibit 7 appears this statement: "Acting on information furnished by William Butler, *complete statement of Butler is hereto attached,* that the subject responsible for the shooting of Terroll Moss resided at 4714 Moffit, Sgt. Troupe and detective Roche proceeded to said address" (emphasis supplied).

While exhibit 7 was not before the trial court, it confirms what was fairly established in the trial of the case: that there is, or at least was at one time, a Butler statement, or statements, taken by a representative of the police department. Likewise, it is clear that Captain Valenti and Detective Hummert had access to the Butler statement and that they did not invent what they attributed to Butler in their own reports. From this we can further conclude the Butler statement referred to in exhibit 7 would have been of great moment to defendant in his defense had it been made available to his counsel at the trial.

As said in Ridge v. Manker (CCA8) 132 F. 599, 601, "An appellate court may avail itself of authentic evidence outside of the record before it of matters occurring since the decree of the trial court when such course is necessary to prevent a miscarriage of justice, to avoid a useless circuity of proceeding . . ."

In Caldwell v. Modern Woodmen of America, 90 Kan. 175, 133 P. 843, 844, the appellate court considered evidence presented to it that the plaintiff's husband was actually alive, not dead, in her suit to collect on an insurance policy on his life, saying: " . . . [T]his court may, and in the very unusual situation presented should, in order to prevent a failure of justice, consider the new evidence . . . [A] miscarriage of justice will not be tolerated so long as the court, by the use of such processes, can apply a remedy." In Curry v. Thompson (Mo.Sup.) 247 S.W.2d 792, 798, this court was presented with a motion filed by the defendant asking the court to consider matters which occurred while the case was on appeal. The court discussed the matter and while declining to consider the after-trial facts presented, indicated its ruling would have been otherwise had the facts been " . . . *of such decisive and conclusive character* as to render a different result reasonably certain . . . "

In my opinion, the situation in the case at bar, with respect to exhibit 7, falls within the principles declared in the three cases cited and is a further ground requiring reversal and remand.

The majority opinion continues our basic approach of treating police reports as sacrosanct. As stated, it took an order of this court to get the police reports for use on appeal. In a recent case, Schleicher v. State, No. 56,508, where the police reports were exhibits in the case, but had not been filed with the record, this court was at first told the police reports would not be produced unless the expense of a police officer to guard the reports while we inspected them was paid. In another recent case, Warren v. State, Mo., 482 S.W.2d 497, there is evidence that part of a police report was not disclosed, somewhat similar to the present case.

We have permitted the police to be a law unto themselves as to police reports. The above examples which have surfaced show what can then happen. It has been said that "Power tends to corrupt and absolute power corrupts absolutely." In my opinion, in fairness it is high time we remove access to information favorable to defendants in police reports from being in the absolute control of the police.

BARDGETT, Judge (dissenting).

I respectfully dissent from that portion of the principal opinion that holds it was not an abuse of discretion for the trial judge to overrule defendant's motion to produce a purported statement of witness William Butler which was in the possession of the prosecutor by reason of its being incorpo-

rated into Exhibit Alpha, the same being a Supplementary police report dated September 10, 1968.

The question here is merely whether or not this isolated statement should have been produced. In order to confine this dissent to the particular issue it is pertinent to state that the issue is NOT whether the entire police report should have been produced nor is the issue whether the statement of Butler as contained in the report is admissible in evidence, nor even whether the statement is accurate as to what Butler said to one or more policemen.

The principal opinion sets forth the events that gave rise to the defendant's motion to produce. Suffice it to say here that the substance of the testimony of Butler at the trial of this case was that a fight occurred in the tavern in which he was tending bar that involved defendant and several others; that Butler broke up the fight and put defendant and others out the door; that defendant left and came back in about a minute or two and at that time Butler was standing in the door holding it half way open with his left hand; that "it had kind of quieted down a little bit and this Terrell Moss, well, he wanted to come back to go out but at the same time Willie Morris was coming back to the door and so when Morris opened the door —" (the outside storm door), "During the time he opened the door and the time that Moss got up, Moss touched me on my left shoulder and when I turned, the pistol went off." Butler stated that defendant was holding the pistol; that "He shot off one, pulled the trigger again and it snapped the second time" but did not discharge; that the first time that Butler saw the gun was when he was looking at it in front of his face before the shot was fired. On two or more occasions during the testimony of Butler he stated that defendant had left the tavern, a minute or more elapsed before he returned and that it was then that defendant fired the shot that killed Moss.

During the course of the testimony of Detective Hummert the Court ordered the prosecution to produce the statements it had, if any, of witness Butler. The prosecution did produce two police reports (Exhibits Alpha dated September 10, 1968, and Beta dated September 3, 1968), and the Court examined them. Exhibit Alpha contains the following:

"While at the scene, the 6th District Officers interviewed the following named persons:

WILLIAM BUTLER, Negro male, 42 years of age, residing at 3117 North Taylor, —"

who stated that he works part time as a bartender at Little Caesar's Lounge, located at 4873 Natural Bridge.

"Continuing, William Butler stated that on Tuesday evening, September 3, 1968, he was tending bar, at which time there was a large crowd of people in the lounge. He stated that he observed two (2) customers arguing near the front door, who then began to struggle with each other. He then left his place at the bar and attempted to push the two subjects out the front door, when some unknown person in the lounge said, 'Look out, he has a gun.' At this time, there was a shot fired, and the victim who was standing next to him (Butler) fell forward and staggered out the door.

"William Butler further stated that the subject with the gun pointed the gun into the lounge and attempted to fire it, however it did not go off, and the subject ran from the doorway of the lounge. He also stated that the subject responsible for the shooting was one:

WILLIE MORRIS, negro male, residing at 4714 Maffitt."

The facts testified to by Butler at trial were descriptive of a situation in which the fight that occurred in the tavern had ended; the defendant had left and thereafter returned with a pistol and shot the deceased at a time when there was no fight going on at all. The facts as reflected in Butler's purported statement to the police

are descriptive of a situation in which there was a fight going on and during the course of the fight a gun went off and Moss was killed, and lends itself to the defense of accidental shooting, which was submitted to the jury by Instruction No. 5, whereas the testimony of Butler at trial was completely opposite in that it practically excluded an accidental discharge of the pistol and was descriptive of an intentional shooting.

Thus the facts of this case fall squarely within the holding of this Court in State v. Aubuchon, Mo., 381 S.W.2d 807. There this Court said, l. c. 814, "We hold now that, if there is a satisfactory showing that a report or statement of a witness in the hands of the State is of such a nature that *without it*, the defendant's trial would be fundamentally unfair, then it should be produced; otherwise not. And this decision rests, in the first instance, in the discretion of the trial court; we may later consider, if and when necessary, an abuse of that discretion. If the trial court wishes to examine the document before ruling, it may do so." The Court went on to say, at l. c. 815, "Thus, if it be fairly shown that a material prosecuting witness had previously made a statement of facts which completely exonerated the defendant, or which would totally change the degree of a crime, this should be produced."

In State v. Cannon, Mo., 465 S.W.2d 584, l. c. 587, the Court quoted portions of the opinion in the Aubuchon case and further said, l. c. 587, "The criticism recently leveled at Aubuchon is the indication therein (also appearing in many other Missouri cases) that there must be an advance showing that there is an inconsistency between the testimony of a witness and the contents of the police report before the report need be produced. Obviously, it would be difficult to make that showing without examining the report."

In the instant case the most restrictive interpretation of Aubuchon, supra, has been satisfied. The trial court did order the production of the police reports and examined the contents of Exhibits Alpha and Beta. Mr. Butler was a material witness for the State. The statement attributable to Butler as it appears in Exhibit Alpha is contrary to Butler's trial testimony, and if the statement that appears in Exhibit Alpha is a correct recitation of what Butler saw take place then the facts as set forth in the statement, if believed by the jury, would not exclude the defense of accident, whereas Butler's trial testimony is not compatible with the defense of accident. Furthermore, if the facts that appear in the statement are correct, the jury may have found the defendant guilty of the lesser offense of manslaughter.

I reiterate, however, that the issue here is whether the statement should have been *produced* under the facts of this case, and not whether it could have been successfully used once it had been produced.

In State v. Cannon, supra, the Court held that the defendant was not prejudiced by the nonproduction of the information contained in the police report pertaining to the description of the robber because the report did not contain any description attributable to any particular witness, but was a composite description obtained by combining each descriptive element contributed by each of six witnesses. The Court said, l. c. 588, "That description would have been of no use to defendant's counsel in trying to impeach a particular witness because it did not purport to be a description given to the police by any specific witness." In the instant case the statement found in Exhibit Alpha is not a composite of statements attributable to several witnesses but, to the contrary, it purports to be a description of the occurrence attributable to one particular witness, Mr. Butler, and recorded as such in the police report Alpha. Exhibit Alpha was compiled after the Coroner's Inquest into the death of Terrell Moss as it refers to the inquest, the appearance of Detectives Roche and Hummert at the inquest and the result. Detective Hummert testified at the inquest

and there stated that a statement had been obtained by the police from Mr. Butler. A reading of Detective Hummert's inquest testimony leaves one with the decided impression that he obtained the statement from Butler. After Detectives Troupe and Roche testified at the trial Detective Hummert was called by the State and it was only then that it was learned that Detective Hummert was not the officer who took the statement from Mr. Butler. It is absolutely certain, however, that there was a statement taken from Butler by the police. Exhibit Alpha demonstrates the apparent contradictions that appear as between the trial testimony of Butler and the statement that the police took from him concerning the occurrence.

As pointed out in State v. Cannon, supra, the requirements of State v. Aubuchon, supra, are difficult for the defendant to overcome so as to obtain a statement given to the police by a witness for the State. In the instant case those difficulties were overcome and the stringent requirements of Aubuchon, supra, have been met. The only item sought by the defendant was the statement or statements of one particular witness, not the entire police report. To say that the statement of Butler would not be admissible in evidence as such does not answer the question in this case, for it is the production of the statement that was requested, not its admission into evidence. It would be pure speculation for this Court to say that had the statement been produced that defense counsel would not have recalled certain witnesses, including Mr. Butler, and utilized the statement to show apparent material inconsistencies in Butler's versions of the occurrence. The term "apparent inconsistencies" is used because, at this point, such merely appear from the face of the statement as compared with the trial testimony of Mr. Butler, and it is not assumed that the account given in the statement is correct, but, like all other statements given by a witness and used in his cross-examination, its validity, and the credibility of the witness, is for the jury to determine. Here, neither the witness Butler nor any police officer has yet had the opportunity to affirm, deny or explain that which appears in the statement. The importance of this matter is demonstrated by making an assumption, but it is only an assumption, and that is that *if* the facts as reflected by the statement are correct and the trial testimony of Butler is incorrect then defendant had been convicted of second degree murder on the basis of at least incorrect evidence and at worst false testimony. Bringing litigation to a final conclusion is vitally important and consequently it would seem that in view of the desirability of finality it becomes even more important that a statement, such as here involved, which was available during the decisional process—the trial, be available for use in that trial, particularly where, as here, all of the requirements enunciated by this Court in State v. Aubuchon, supra, have been satisfied. To close off the production of the statement taken from a witness under the facts of this case effectively eliminates cross-examination of the witness based upon apparent material inconsistencies that would appear upon production of the statement. This, in my opinion, renders the trial "fundamentally unfair" under State v. Aubuchon, supra.

Based upon the principles stated in State v. Aubuchon, supra, and reiterated in State v. Cannon, supra, and without going outside the trial court record in this case I would reverse and remand the cause for new trial for the prejudicial error in overruling the defendant's motion to produce the statement of Butler as it appears in Exhibit Alpha. The failure of the prosecution to produce Exhibit 7, mentioned in the dissent of Judge Seiler, when ordered by the trial court is extremely disconcerting. Nevertheless we need not consider that aspect of this appeal in order to rule this case and remand the cause for a new trial under the existing law of this State.