**Eugene MASON, Petitioner-Appellant,**

**v.**

**STATE OF ARIZONA, A. E. Gomes, Superintendent, Arizona State Prison at Florence, Respondent-Appellee.**

**No. 73-2266.**

United States Court of Appeals, Ninth Circuit.

Oct. 3, 1974.

Certiorari Denied Feb. 18, 1975. See 95 S.Ct. 1145.

---

Bruce Rinaldi (argued), of Post-Conviction Legal Assistance Clinic, University of Arizona College of Law, Tucson, Ariz., for petitioner-appellant.

William J. Schafer, III, Asst. Atty. Gen. (argued), Phoenix, Ariz., for respondent-appellee.

## OPINION

Before HAMLEY, WRIGHT and KILKENNY, Circuit Judges.

HAMLEY, Circuit Judge:

Eugene Mason, incarcerated in Arizona State Prison under a life sentence for first degree murder, appeals a district court judgment denying his application for a writ of habeas corpus.

Mason, an indigent, was represented in the state criminal proceedings by court-appointed counsel. Several times prior to the trial Mason's attorney moved for court appointment of an investigator. Counsel also sought an allowance of funds for travel expenses in connection with investigation of certain witnesses. These motions were denied, except that Mason's attorney was allowed one hundred dollars for investigative expenses, and was advised to submit a claim for fifty dollars' expense incurred in preparing interrogatories.

Mason contends on appeal that the failure of the state trial court to appoint an investigator to assist Mason's counsel or to allow more public funds than were

actually provided for the use of Mason's attorney in conducting investigations: (1) denied Mason his rights to a fair trial, to the effective assistance of counsel, and to confront and cross-examine witnesses in violation of the Due Process Clause of the Fourteenth Amendment, and (2) denied him equality of treatment with indigent defendants represented by the Maricopa County Public Defender's office in violation of the Equal Protection Clause of the Fourteenth Amendment. We affirm.

Mason and Thomas Anthony Sanchez were jointly charged with the first degree murder of Charlie "Casey" Byrn on or about February 11, 1967. Byrn operated a bar in Phoenix, Arizona. On the night of his death, while carrying a roll of currency from the cash register, Byrn was struck down in a dark alley behind the bar by someone wielding an iron rod.

Mason and Sanchez were both originally represented by the Public Defender's office of Maricopa County, Arizona. Following two preliminary hearings and the entry of pleas of not guilty by Mason and Sanchez, the Public Defender moved to withdraw as counsel for both defendants, because of an asserted conflict of interest between them. The state court granted the motion and appointed a separate private attorney to represent each defendant. Six weeks later, and with the consent of Mason, his court-appointed attorney was replaced by another court-appointed attorney.[1]

On December 13, 1967, the attorneys for both Mason and Sanchez moved that the court provide them with copies of the transcripts of the two preliminary hearings. They also moved that each defendant be provided, at state or county expense, with an investigator skilled in the investigation of criminal cases. In a supporting memorandum, counsel stated, as justification for this motion, that the state had endorsed upon the information some twenty-three witnesses. A good many of these witnesses, counsel advised, were not police officers and some were out-of-state witnesses.

The court denied the motions. However, the court ordered that the transcripts of the preliminary hearings be made available to counsel for reasonable periods of time. In denying the motion for investigators, the state court observed that it had been advised that the investigative staff of the Public Defender's office would be available to assist the defendants.

On January 26, 1968, Mason's attorney again moved the state court to appoint an investigator to assist him, pointing out that the conflict of interest between Mason and Sanchez had precluded the Public Defender's office from rendering investigative assistance. On February 9, 1968, the state court relieved the Public Defender's office from investigative responsibilities insofar as Mason and Sanchez were concerned. The renewed motion by Mason's counsel was taken under advisement.

On February 18, 1968, Mason's attorney moved for a bill of particulars. On the following day, both defense attorneys requested that Maricopa County advance the cost of round-trip airline transportation to Sacramento, California, of two days' lodging, and for hiring a motor vehicle. The purpose of the trip was to interview "Mr. Chamblin who is a material witness for the State in this case." The motion also sought round-trip airline transportation to Gettysburg, Pennsylvania, lodging and vehicle expenses to interview "Mr. Roberts who is a material witness for the State in this case." These expenses were stated to be necessary for defendants to "prepare properly for the trial of this case" and assure that the indigent defendants "are afforded the full protection and guaranty" of Article II, Section 24, Arizona Constitution, A.R.S., and the Sixth and Fourteenth Amendments of the United States Constitution.

On February 20, 1968, Mason's attorney petitioned under Rule 195 of the

---

1. Neither of Mason's trial attorneys represent him on this appeal.

Arizona Rules of Criminal Procedure, 17 A.R.S., for the production of seven items of evidence.[2] At the hearing on the petition to produce, the state court explained that its ruling on the advancement of costs would depend on how much information the state would turn over to defense counsel. Following this hearing the prosecution was ordered to produce items (1) through (6) by March 11, 1968.[3]

On March 4, 1968, the state court denied the motion for appointment of an investigator but ordered an advancement of costs in the amount of one hundred dollars to counsel for each defendant "to hire private investigators or as payment for their own investigation, whichever couinsel prefers." On March 19, 1968, the court denied Mason's motion for a bill of particulars but granted the application for issuance of a subpoena duces tecum to, and deposition of, the Sacramento Chief of Police.

On April 22, 1968, the state notified Mason's attorney that it intended to call co-defendant Sanchez as a witness at the trial, and that the state would move at the time of trial to dismiss the charges against Sanchez. The answers and records requested by the interrogatories were returned on April 26, 1968.[4] On April 29, 1968, the day before the trial, the state trial judge denied Mason's request to review his motion for appointment of an investigator and advancement of costs. The court refused to take "testimony" on this renewed motion on the ground that the court had previously ruled on the motion. At this time the court also granted the state's motion to dismiss the charges against Sanchez.

The trial commenced on April 30, 1968. The state called ten witnesses, the first seven of which testified to general information nearly identical to that which they had given at the first preliminary hearing. The state's last three witnesses, Roberts, Williamson and Sanchez, presented testimony having the effect of directly linking Mason to the crime, through his purported statements and activities. The defense called two witnesses, Mr. Mischung (one of Roberts' former employers) and defendant Mason. The district court found that the evidence against Mason was "overwhelming." A jury verdict of guilty was followed by a judgment of conviction. On Mason's appeal to the Arizona Supreme Court, his conviction was affirmed. State v. Mason, 105 Ariz. 466, 466 P.2d 760 (1970).

Mason contends that the denial of investigative services described above deprived him of his right to a fair trial, to the effective assistance of counsel, and to confront and cross-examine witnesses, as guaranteed by the Due Process Clause of the Fourteenth Amendment.

In the state pre-trial proceedings, the efforts of Mason's counsel to obtain investigative assistance were primarily directed to obtaining court appointment of an investigator. Counsel did seek an allowance for travel funds in order that he, himself, could interview certain pros-

2. The items sought to be produced were: (1) any statement from Roberts to two police officers on February 12, 1967; (2) any statement of Roberts to Officer Ezell in August of 1967 taken in Pennsylvania; (3) any statements by Chamblin to the Sacramento or Phoenix police relating to the crime; (4) the F.B.I. Rap Sheets on Roberts and Chamblin; (5) any notes or memoranda of any interviews of Roberts or Chamblin by four named police officers; (6) the results of scientific tests performed on an angle iron found at the scene; and (7) any "D.R.'s" prepared by the Phoenix Police Department relating to interviews with witnesses endorsed on the information.

3. The court stated that item No. 7 (discovery of all D.R.'s relating to witnesses) was "pretty broad." Mason's attorney agreed, saying "as to that I don't have anything to back that up, really. . . ."

4. Mason's attorney advised the court that the Sacramento Public Defender had billed him fifty dollars for obtaining answers to the interrogatories. The court stated: "Make up your formal claim and I'll see what I will do." The record does not disclose whether Mason's attorney filed such a claim and, if so, whether it was paid.

ecution witnesses. Implicit, moreover, in his request for appointment of a special investigator is the request that, if such an investigator cannot be appointed by the court, there should be at least a reasonable allowance of funds so that counsel could employ his own investigator.

■ The Supreme Court has found a violation of the Constitution in a number of circumstances where a defendant's poverty has undermined his ability to defend himself. In Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (1963), the Court held the Sixth Amendment right of an indigent to assistance of counsel applicable to the state criminal process through the Due Process Clause of the Fourteenth Amendment. The Court reaffirmed the earlier tenets sounded for federal defendants in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), stating:

> "Not only these precedents but also reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." 372 U.S. at 344, 83 S.Ct. at 796.

Barriers to appellate review for indigents have likewise been held violative of equal protection. In Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891 (1956), the Supreme Court required that indigents be furnished with transcripts in order for their appeals to be effective. The Court explained: "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Id.* at 19, 76 S.Ct. at 591. The decision in Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), relied heavily on *Griffin* in holding that indigents must likewise be provided with counsel on appeal.[5]

■ The principles steadfastly announced in the Supreme Court decisions reviewed above require us to hold that the effective assistance of counsel guarantee of the Due Process Clause requires, when necessary, the allowance of investigative expenses or appointment of investigative assistance for indigent defendants in order to insure effective preparation of their defense by their attorneys.[6] United States v. Germany, 32 F.R.D. 421 (N.D.Ala.1963). *See* Lee v. Habib, 137 U.S.App.D.C. 403, 424 F. 2d 891, 899, notes 27, 28, 29 (1970); Christian v. United States, 398 F.2d 517, 519 note 7 (10th Cir. 1968). *Cf.* Bush v. McCollum, 231 F.Supp. 560 (N.D. Tex.1964), aff'd. 344 F.2d 672 (5th Cir. 1965).

■ The failure of the state to provide such assistance, when needed, results in ineffective trial representation.

5. The Supreme Court has since been vigilant in upholding and extending these principles of equality. *E.g.*, Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (right to counsel for misdemeanors and in petty offenses); Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969) (transcript for appealing a violation of a municipal ordinance); Gardner v. California, 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (1967) (transcript of evidentiary hearing in habeas corpus proceeding, for use in *de novo* application to higher court); Roberts v. La Vallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (transcript of preliminary hearing); Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963) (screening in forma pauperis cases for appeal); Smith v. Ben-

nett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (conditioning a collateral attack on a conviction on a filing fee); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (conditioning direct appeal on payment of a filing fee).

6. The Congress in providing for the adequate representation of federal indigent defendants in 18 U.S.C. section 3006A(e), the American Bar Association in promulgating minimum standards for criminal justice, ABA Standards Relating to Providing Defense Services section 1.5, and even the State of Arizona in providing for county Public Defender's offices, A.R.S. section 11–581 et seq., have adopted the theory that investigative assistance is sometimes a necessity for an adequate defense.

██ Our holding denotes, however, that such assistance is not automatically mandatory but rather depends upon the need as revealed by the facts and circumstances of each case. In the nature of things it may be difficult, in advance of trial, for counsel representing an indigent defendant to demonstrate an undoubted need for such funds. However, he can at least advise the court as to the general lines of inquiry he wishes to pursue, being as specific as possible. He should also advise the court why it is not practicable for counsel himself to make the investigation, with or without the allowance of out-of-pocket expenses. If a reasonable showing of this kind is made, the state trial court should probably view with considerable liberality a motion for such pre-trial assistance. *Cf.* United States v. Schultz, 431 F.2d 907, 911 (8th Cir. 1970); Christian v. United States, 398 F.2d 517, 519–520 (10th Cir. 1968).[7]

██ However, when an appellate court is presented with the question of whether the disallowance or limitation of investigative funds has deprived an indigent defendant of due process of law, quite different considerations are applicable. The trial has then occurred and counsel for such a defendant is in a much better position to demonstrate, if he can, that there has been a denial of due process. The question then becomes whether the denial or restriction of investigative funds has substantially prejudiced the defendant at the state court trial.

██ At the appellate stage, the inquiry is analogous to that which is to be made when a federal indigent defendant asserts, on appeal, that he has been denied investigative funds which should have been allowed under 18 U.S.C. § 3006A(e), a provision of the Criminal Justice Act of 1964. It is fair to assume that 18 U.S.C. § 3006A(e) is designed to accord federal prisoners full constitutional rights under the Due Process Clause and the Sixth Amendment. Thus the manner in which that section is applied, on appellate review, should provide reliable guidance as to appellate review of state trial denials and limitations with respect to investigative funds.

██ In federal reviews involving section 3006A(e), reversal is indicated only where a defendant has established prejudice by clear and convincing evidence. United States v. Sanders, 459 F.2d 1001 (9th Cir. 1972); United States v. Washabaugh, 442 F.2d 1127, 1130 (9th Cir. 1971). We are also of the view that in determining whether such a showing has been made, due consideration must be given to the question of whether defense counsel, at the time of requesting the allowance of funds, made as complete a showing of necessity as could then be reasonably expected of him.

██ With these principles in mind we turn to an examination of the showing of prejudice made by counsel for Mason. At the time of seeking the appointment of an investigator, the only need stated was that the state had endorsed upon the information some twenty-three witnesses, that a good many of these witnesses were not police officers, and that some were out-of-state witness-

---

7. Mason contends that one facet of the Arizona procedure for obtaining the allowance of funds for investigative purposes is particularly prejudicial. This is the fact that upon the hearing of any such court application for funds the prosecutor is present and thereby gains firsthand knowledge of defense strategy, and moreover is given the opportunity to oppose the motion. We decline to evaluate this objection because it does not appear from the record before us that Mason made any effort to have these motions considered *ex parte.*

We note that, under 18 U.S.C. § 3006A(e), hearings for the purpose of considering motions for the allowance of investigative funds under the Criminal Justice Act of 1964 are conducted *ex parte.* Where counsel for defendant objects to the presence of Government counsel at such a hearing, the failure to hold an *ex parte* hearing is prejudicial error. United States v. Sutton, 464 F.2d 552 (5th Cir. 1972); Marshall v. United States, 423 F.2d 1315 (10th Cir. 1970). It may be that the courts of Arizona, if requested to do so, would also conduct such hearings *ex parte.*

es. No effort was made to advise the court as to what lines of inquiry counsel desired to pursue or, in the absence of a court-appointed investigator, how much investigative funds counsel needed. Nor did counsel make any showing as to why it was impracticable for counsel to personally conduct the needed investigation, with or without the allowance of out-of-pocket expenses.

With regard to counsel's application for funds for travel to Sacramento and Gettysburg, the state trial court was advised in generalities that the purpose of these trips was to interview and to investigate the backgrounds of James William Chamblin and Floyd Ransom Roberts, both of whom were material witnesses for the state.

Not until this appeal did the counsel spell out with specificity that this investigation was necessary to "examine factors which determine their credibility" and to discover the names and addresses of witnesses to contradict the damaging admission by Mason allegedly made in conversation to Chamblin and Roberts.

The record before us provides little support for these representations by counsel. Chamblin did not testify at Mason's trial, and therefore his credibility was not in issue. As to Roberts' credibility, counsel for Mason's cross-examination covered over one hundred pages in the transcript. It shows that defense counsel knew intimate details about Roberts, gained presumably from Roberts' preliminary hearing testimony and from various depositions.[8]

As for Mason's claim that other witnesses were present on the occasion when he was alleged to have made incriminating statements in the presence of Chamblin and Roberts, Mason himself testified at the trial that no one was present except the people he had already named. In Mason's reply brief it is asserted that trial counsel for Mason did not know until the trial that one of the persons present on this occasion was George Bruce Williamson. Counsel speculates that if Mason's trial counsel had known of Williamson's presence prior to the trial, he might have investigated him and obtained information helpful to Mason's defense.

However, Mason was himself present on this occasion and was capable of advising his attorney as to Williamson's presence. Moreover, the transcript of the second preliminary hearing, to which trial counsel had access, reveals that Williamson had attended this gathering and that he heard Mason say he had killed a man. This transcript also disclosed Williamson's Sacramento address.

Considering the record as a whole, we conclude that Mason has not shown, by clear and convincing evidence, that he was substantially prejudiced at the state trial by the denial of investigative assistance or the failure to provide a greater amount of funds. It follows that, insofar as Mason's due process argument is concerned, the district court did not err in denying the application for a writ of habeas corpus.

This brings us to Mason's equal protection argument. In substance, this contention is that since the Maricopa County Public Defender provides special investigators to assist indigent criminal defendants being represented by that office, the failure to appoint a special investigator to assist Mason's appointed counsel or, in the alternative, to provide adequate investigative funds, violated the Equal Protection Clause of the Fourteenth Amendment.

■ The classification which resulted, whereby Mason was denied investigative services by the Public Defender, while all other indigent criminal defendants in that county were provided with such services, involves no "fundamental" right guaranteed by the Constitution

---

8. This familiarity covered such facts as: Roberts had lived with a girl friend instead of his sister, as he had claimed; felony charges were dropped out of state against Roberts to enable him to testify in Arizona; he had been paid thirty-five dollars at the preliminary hearing.

and therefore is not inherently suspect. It follows that the strict "compelling state interest" test [9] is not applicable. *See* San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 18–24, 31–35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Mahan v. Howell, 410 U.S. 315, 322–323, 328–329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). *See also*, Village of Belle Terre v. Boraas, 415 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (the Court describes the kinds of cases in which a classification may be inherently suspect). The proper test to be applied is whether the classification has a rational basis or connection with a valid state interest.

The state's asserted interest in denying Mason access to the Public Defender's investigative staff is to prevent a conflict of interest between two criminal defendants. It is an established constitutional principle that such a conflict precludes representation by the same attorney. *See* Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Kruchten v. Eyman, 406 F.2d 304 (9th Cir. 1969). Such representation reasonably extends to the matter of special investigative services, since the fruits of such investigations might well assist one defendant at the expense of the other. *Cf.* Marshall v. United States, 423 F.2d 1315, 1319 (10th Cir. 1970). There is no question but that a conflict of interest existed between Mason and his original co-defendant, Sanchez, who testified against Mason at the trial, thereby exculpating himself.

Under the rational basis test,[10] however, the denial of any and all defense services, regardless of need, is not a reasonable means of resolving such a conflict of interest problem. After *Gideon,* no one would argue that an indigent defendant deprived of representation by the Public Defender by a conflict of interest would then have to personally compensate, or do without, a court-appointed attorney. *Cf.* James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972). Therefore, unless the state provided Mason with an equivalent and fundamentally fair substitute for the normally available investigative services of the Public Defender's investigative staff, he has been denied equal protection. *See* MacCollum v. United States, (9th Cir. August 2, 1974).

In our further view, in order to be equivalent and fundamentally fair, the substitute provided by the county need not take the form of the appointment of a special investigator at public expense, but may be accomplished by the allowance of investigative funds for use by the indigent defendant's counsel.

Whether equivalent assistance was furnished to Mason must be determined by reference to the investigative services available through the Public Defender. While the Maricopa County Public Defender may, pursuant to A.R.S. Section 11–586A, utilize his investigative staff without obtaining prior court approval, the availability of such staff is the result of legislative appropriations and oversight which place reasonable restrictions thereon. As an equivalent and fundamentally fair substitute for such legislative control it is permissible for Arizona to require a showing reasonably adequate to convince a court that there is a necessity for such an allowance.

As pointed out above, in discussing the due process argument, such a showing may be difficult to make in advance of trial, since the attorney representing the indigent may not then be able to document the need. Accordingly, as we have indicated, a state court should probably view with considerable liberality a motion for such pre-trial assistance. Nevertheless, it is appropriate for such a court to take into account the circumstances actually revealed or capable of presentation, and to give due

---

9. *See* McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

10. *See* Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 172–176, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

weight to the fact that an attorney representing an indigent criminal defendant may well be able to conduct most if not all of the needed investigation with or without the allowance of additional expense.

When such an equal protection problem is presented in the appellate court, however, the same test is to be applied as in the case of a due process contention. As we have stated above, that test is whether the defendant has established substantial prejudice by clear and convincing evidence. Applying that test, we have already concluded that no such showing has been made. It follows that the district court did not err in rejecting Mason's equal protection argument.

Affirmed.