WELLIVER, Judge.
 

 Appellant, Ronald Brown, was convicted of second degree murder in the shooting death of Rickey Perkins, and was sentenced to 55 years’ imprisonment under the Second Offender Act, § 556.280, RSMo 1969. Appellant seeks reversal of his conviction, alleging juror misconduct and alleging that the trial court erred in denying his motion to depose twelve witnesses at state expense. The case was transferred after opinion from the Court of Appeals, Eastern District, and we decide it as though on original appeal. Mo.Const. art. V, § 10. We affirm.
 

 Shortly after midnight, in the early morning of February 2,1975, Deborah Harris was watching television in the living room of the home of her parents, Arthur and Mildred Wallace, at 5410 West Floris-sant, St. Louis, Missouri. With Ms. Harris were her sister, Audrey Thomas; Deborah’s boyfriend, Cadaryl Cobbs; and Rickey Perkins, a friend of Mr. Cobbs. No interior lights were on in the room other than the television. Ms. Harris was holding her infant son in her arms. Two other children were sleeping on a pillow on the floor. Audrey Thomas was lying on the floor in the adjoining dining room, which was connected to the living room by an open double doorway. Cadaryl Cobbs was seated on the couch. Rickey Perkins was seated in a chair by the front door.
 

 A car stopped in front of the Wallace home and several people got out of the car. Bessie Turner and her daughters, June and Judy Turner, approached the Wallace house accompanied by appellant Ronald Brown, William McAfee, and two nieces of Ms. Turner, Jeanette and Jessie McAfee. Ms. Turner knocked on the Wallace’s front door, and asked to speak to Deborah’s mother. As Deborah walked away from the door to summon her mother, the Turners and appellant pushed open the door and entered the living room. Bessie Turner questioned Deborah, Audrey, Cadaryl and Rickey con
 
 *500
 
 cerning the breakage of a window at the Turner home earlier in the evening.
 
 [1]
 

 Deborah Harris testified that appellant and Rickey Perkins argued about the broken window, and Perkins denied breaking it. Appellant pushed Perkins against Ms. Harris, who was still holding her infant son, and she lost her balance. Deborah Harris testified that appellant then produced a gun from under his coat and shot Rickey Perkins in the chest. Ms. Harris testified that Perkins had not struggled with or struck appellant prior to the shooting. After the shot was fired, the Turners, McAfees and appellant promptly left the premises.
 

 Audrey Thomas and Cadaryl Cobbs testified and corroborated the account of the incident given by Ms. Harris. Eleanor Wallace testified that she was in the bedroom and did not witness the shooting. Mildred Wallace testified that she had also been in another room, and that she was sleeping until she was awakened by the sound of a gunshot. She ran into the living room and looked out of the front door in time to see Bessie Turner and several others run across the front lawn.
 

 St. Louis Police Officers Robert Proelich, Michael Roe and Gerald Behrman testified that they were called to the Wallace home on the morning of February 2, 1975. Froe-lich testified that he saw Perkins lying on the floor with a bullet wound in his chest, and that he spoke to Perkins. Froelich and Behrman interviewed the people who were present; Roe conveyed the injured Perkins to the hospital.
 

 John J. Thomas, M.D., a pathologist employed by the Coroner’s Office of the City of St. Louis, testified that he examined Perkins’ body on February 3, 1975, and determined that Perkins’ death was caused by a penetrating gunshot wound to the heart with massive hemorrhage into the left pleural cavity. Thomas testified that there were no powder burns around the entry wound in Perkins’ chest. A lead bullet was recovered from the posterior chest wall of Perkins’ body.
 

 St. Louis Police Officer John Letz testified that he apprehended appellant at 1115 Tower Grove Avenue in St. Louis on February 3, 1976. St. Louis Deputy Sheriff Leslie Johnson testified that on June 18, 1976, while appellant was being transported from outstate on a bus, appellant escaped by diving out of the bus window. St. Louis Police Officer Olyn Hudspeth testified that he and a partner apprehended appellant at 3547 Martin Luther King Drive in St. Louis on July 19, 1976. Major Leonard T. Smith testified that he was in charge of the St. Louis City Jail on August 4, 1976, and that on that date appellant escaped from the jail. St. Louis Police Officer Richard Miller testified that he and several other officers apprehended appellant at 4352A Delmar in St. Louis on August 4, 1976.
 

 Appellant called as his witnesses Jeanette McAfee, Jessie McAfee and William McAf-ee. Jeanette and William McAfee both testified that they had seen the shooting incident on February 2,1975; that Perkins had first produced the gun and that Perkins struck appellant on the side of the head with the gun; that appellant fell, and as he struggled to his feet, Perkins prepared to strike appellant a second time; that appellant blocked the blow and the gun fell to the floor; and that as appellant and Perkins struggled for the gun, it went off, wounding Perkins. Jessie McAfee testified that she stood on the porch during the incident, but saw that appellant was bleeding from a cut on the left side of his head as he left the Wallace home. In rebuttal,
 
 *501
 
 the state called St. Louis Police Officer Joseph Boul, and introduced into evidence photographs of appellant which Boul testified had been taken on May 16, 1969, June 12, 1974, and July 19, 1976. The pictures taken prior to the 1975 shooting incident showed that appellant had a scar on his left eyebrow.
 

 The substitute information charging appellant with first degree murder was filed on July 5, 1977. Appellant was found to be indigent within the meaning of § 600.086, RSMo 1978, after a hearing, and Cornelius Lane was appointed to represent appellant at trial. Appellant instead was represented at trial by attorney Murry A. Marks.
 

 On December 31, 1976, appellant filed a motion to take depositions in forma pauper-is under Rule 25.41 (now Rule 25.12). Appellant alleged that it was “necessary and essential to his defense” that he depose twelve persons
 
 [2]
 
 whom the state had endorsed as witnesses. Appellant further alleged that he was indigent and unable to pay for transcribing and typing such depositions. Appellant requested the court to order the circuit attorney for the City of St. Louis to produce the persons listed and to order that the expenses of taking their depositions be borne by the state. A hearing on the motion was held on January 5, 1977, and the motion was taken under submission. In the hearing, appellant’s attorney Murry Marks suggested as an alternative to ordering that the state pay the cost of depositions of the twelve witnesses, that the trial court enter an order requiring that five of the witnesses — Deborah Harris, Audrey Wallace, Cadaryl Cobbs, Mildred Wallace, and Eleanor Wallace — be summoned to an interview in the office of the state’s attorney at a time to be agreed upon by the state’s attorney. Marks stated that he would “be happy to tape record for my records a conversation or interview with each of those persons, which will not cost the State any money.” Mr. Marks insisted that the depositions were needed, but said “that as a reasonably viable alternative if you should deny my request for depositions in forma pauperis, that you consider my alternative oral suggestion and request an oral motion that you order the attendance of these persons so that they can at least be recorded on tape which is a reasonably viable substitute.” On March 16, 1977, the trial court entered an order denying the motion to take depositions in forma pauper-is. In denying the motion, the trial court appeared to rely on the fact that although § 600.150, RSMo 1978, permits state financing of services other than counsel on a showing of necessity and inability of the defendant to pay, the state authorizes such an order only where the defendant is represented by “appointed counsel.” Since appellant was being represented by an attorney other than whom the trial court had appointed to represent him, the trial court appeared to hold that there was no statutory authority for the state-financed discovery requested.
 
 [3]
 

 The cause proceeded to trial on July 5, 6 and 7, 1977, and resulted in a verdict of guilty of second degree murder. On August 5, 1977, appellant filed a motion for new trial, alleging that a juror, later stipulated to be Georgia Goodrum had spoken about the case to friends of appellant, Cynthia Blackmon and Peggy Johnson, in the courthouse hallway, while the trial was in progress. In a hearing on appellant’s motion for new trial held August 12, 1977, Blackmon and Johnson testified that Good-rum approached them during a recess in the trial, and asked whether they were relatives of appellant. Goodrum then allegedly stated: “Well, he’s guilty, I can see it in his
 
 *502
 
 face.” Blackmon testified that she told appellant about the conversation before the trial concluded, but that she did not tell appellant’s attorney until after trial. Johnson testified that she did not tell appellant or appellant’s attorney about the conversation until after the trial. At the conclusion of the hearing on appellant’s motion for new trial, the trial court stated on the record that it found the testimony of Black-mon and Johnson concerning the alleged juror misconduct “is not worthy of belief, is not credible and the Court, therefore, rejects it.” The court overruled appellant’s motion for new trial upon the conclusion of the hearing on August 12, 1977.
 

 Appellant filed notice of appeal on August 22,1977. The court of appeals filed an opinion on March 20, 1979, which would affirm the judgment of conviction, and overruled appellant’s motion for rehearing on May 9, 1979. On June 19, 1979, we ordered the case transferred to this Court.
 

 The case presents two issues for determination: is appellant entitled to reversal of his conviction because of alleged juror misconduct, and did the trial court err in overruling the appellant’s motion to take depositions at state expense of twelve of the state’s witnesses prior to trial. We treat each question separately and answer each in the negative.
 

 The trial court heard the testimony of the witnesses concerning the alleged juror misconduct, and found it incredible. The court’s summation of the new trial hearing, preserved in the record, showed that it was sensitive to the importance of appellant’s allegations of juror misconduct and that it carefully considered the evidence on that issue. “The law does not favor charges which seek to impeach the verdict of a jury. They must be clearly established.”
 
 State v. Rasco,
 
 239 Mo. 535, 587, 144 S.W. 449, 465 (1912). In this context, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses.
 
 Id.
 
 Rule 73.01.3(b).
 

 Appellant’s own witness, Cynthia Blackmon, testified that she told appellant about the juror’s alleged conversation with her before the case was submitted to the jury. Prior to sentencing, appellant told the trial court that he was made aware of the juror’s alleged misconduct, and that he informed his attorney about it, during the trial. The alleged misconduct was first brought to the attention of the trial court in appellant’s motion for a new trial. It is well-established that where misconduct of jurors is first presented in the motion for new trial, an affirmative showing must be made that both defendant and his attorney were ignorant of the misconduct until after the trial.
 
 State v. Turley,
 
 452 S.W.2d 65, 69 (Mo.1970);
 
 State v. Reeder,
 
 394 S.W.2d 355, 357 (Mo.1965);
 
 State v. Flinn,
 
 96 S.W.2d 506, 513 (Mo.1936);
 
 State v. McGee,
 
 336 Mo. 1082, 1093, 83 S.W.2d 98, 104-05 (1935);
 
 State v. Gilmore,
 
 336 Mo. 784, 789, 81 S.W.2d 431, 433 (1935);
 
 State v. McVey,
 
 66 S.W.2d 857, 859 (Mo.1933);
 
 State v. Palmer,
 
 581 S.W.2d 952, 953 (Mo.App.1979);
 
 State v. Bollinger,
 
 560 S.W.2d 606, 608 (Mo.App.1978);
 
 State v. Warren,
 
 469 S.W.2d 662, 663 (Mo.App.1971). The reason for the rule is that a defendant is not entitled to wait until the verdict is in, gambling on a favorable verdict, then seek a new trial if a verdict of guilty is returned.
 
 State v. Raspberry,
 
 452 S.W.2d 169, 174 (Mo.1970);
 
 State v. McQuerry,
 
 406 S.W.2d 624, 630 (Mo.1966);
 
 State v. McGee,
 
 336 Mo. 1082, 1093, 83 S.W.2d 98, 104-05 (1935);
 
 State v. Trainer,
 
 336 Mo. 620, 625-27, 80 S.W.2d 131, 134-36 (1935);
 
 State v. Rasco,
 
 239 Mo. 535, 584-87, 144 S.W. 449, 464-65 (1912);
 
 State v. Robinson,
 
 117 Mo. 649, 666, 23 S.W. 1066, 1071 (1893);
 
 State v. Vinson,
 
 503 S.W.2d 40, 41-42 (Mo.App.1973);
 
 State v. Robbins,
 
 455 S.W.2d 24, 27 (Mo.App.1970);
 
 State v. Blair,
 
 280 S.W.2d 687, 689 (Mo.App.1955). Appellant’s knowledge of the alleged misconduct prior to the conclusion of trial prevents its consideration when raised for the first time in the motion for new trial, even though appellant’s counsel did not learn of it until after trial. Appellant had the duty to inform his attorney, so that the proper steps could have been taken.
 
 State v. McGee,
 
 336 Mo. 1082, 83 S.W.2d 98, 104-05 (1935);
 
 State v. Burns,
 
 85 Mo. 47, 50 (1884);
 
 State v. Bizzle,
 
 500 S.W.2d 259, 264 (Mo.App.1973). We find that this point was not timely raised.
 

 
 *503
 
 Appellant contends that the trial court committed prejudicial error in overruling his motion to take depositions in forma pauperis of several of the state’s witnesses. Appellant alleges that denial of state funding of such depositions violates the requirement of the due process clause of the fourteenth amendment that effective counsel be provided to indigents accused of crime, and violates the equal protection clause of the fourteenth amendment, in that it creates an “untenable and illogical” distinction between indigent defendants who are represented by public defenders or appointed counsel on the one hand and indigent defendants who are represented by privately retained counsel on the other. Appellant also alleges that the failure to provide the requested funds violated his right to due process and to defend himself under the Missouri Constitution. Mo.Const. art. I, §§ 10, 18(a). Appellant alleges that his inability to depose the witnesses against him prevented him from effectively cross-examining those witnesses to impeach their credibility.
 

 We acknowledge that effective assistance of counsel is part of the guarantee of the due process clause.
 
 Gideon v. Wainwright,
 
 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963);
 
 Mason v. Arizona,
 
 504 F.2d 1345, 1351 (9th Cir. 1974),
 
 cert. denied,
 
 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975);
 
 United States v. Germany,
 
 32 F.R.D. 421, 425 (M.D.Ala.1963). It is also true that the equal protection clause requires that the state “provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.”
 
 Britt v. North Carolina,
 
 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971).
 
 Accord, Griffin v. Illinois,
 
 351 U.S. 12, 17-19, 76 S.Ct. 585, 589-90, 100 L.Ed. 891 (1956). We do not find that either of these constitutional guarantees have been violated in the circumstances presented.
 

 This Court has held that the refusal to advance state funds for depositions to indigent criminal defendants does not violate the requirement of due process that he be provided effective counsel, and that it does not violate equal protection to fail to provide state financing for depositions merely because such depositions were available to people of means, under either the United States or the Missouri Constitutions.
 
 State v. Aubuchon,
 
 381 S.W.2d 807, 812-13 (Mo.1964).
 
 Accord, State v. Wallace,
 
 504 S.W.2d 67, 69-70 (Mo.1973);
 
 State v. Bibbs,
 
 461 S.W.2d 755, 759 (Mo.1970).
 
 See, State v. McCormick,
 
 426 S.W.2d 62, 63 (Mo.1968)
 
 cert. denied,
 
 394 U.S. 930, 89 S.Ct. 1199, 22 L.Ed.2d 460,
 
 habeas corpus relief denied, McCormick v. Swenson,
 
 328 F.Supp. 646, 648 (E.D.Mo.1971).
 
 See also State v. Davis,
 
 153 W.Va. 742, 750-51, 172 S.E.2d 569, 574-75 (1970).
 

 The equal protection claim raised in the case at bar is different from that raised in
 
 Aubuchon.
 
 In
 
 Aubuchon,
 
 the Court noted that no statute authorized providing an indigent criminal defendant depositions at state expense. 381 S.W.2d at 812.
 
 Cf. Murphy v. State,
 
 265 Ind. 128, 352 N.E.2d 479, 481-83 (1976). In 1972, after
 
 Aubu-chon, Bibbs,
 
 and
 
 McCormick
 
 were decided, however, the General Assembly enacted a statute which authorizes the court to order the advancement of funds for “services required for an adequate representation” upon the ex parte application of counsel who was appointed under the provisions of § 600.150, RSMo 1978, to represent an indigent criminal defendant. The statute authorizes such an order provided the court is satisfied after an ex parte hearing that two requirements are met: “that the services are necessary and that the indigent person is financially unable to obtain them.” § 600.150.2, RSMo 1978.
 
 [4]
 
 Appellant’s equal protection contention is that this statute impermissibly distinguishes indigent defendants who are represented by appointed counsel from those who are represented by privately retained counsel.
 

 
 *504
 
 Appellant contends that it is “untenable and illogical” to distinguish indigent defendants represented by appointed counsel from indigent defendants represented by privately retained counsel for the purpose of determining eligibility for state-financed support services, and that such a distinction violates the equal protection clause of the fourteenth amendment. The classification which resulted in the denial to appellant of state-financed depositions is not a classification that involves “fundamental” rights guaranteed by the Constitution.
 
 Mason
 
 v.
 
 Arizona,
 
 504 F.2d 1345, 1353-54 (9th Cir. 1974),
 
 cert. denied,
 
 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975).
 
 See San Antonio Independent School District v. Rodriguez,
 
 411 U.S. 1, 18-22, 93 S.Ct. 1278, 1288-90, 36 L.Ed.2d 16 (1973);
 
 State v. Aubuchon,
 
 381 S.W.2d 807 (Mo.1964). Consequently, the proper test to be applied in analyzing appellant’s equal protection claim is whether the classification has a rational basis. This test requires that we determine what legitimate state interest might be promoted by the classification challenged by appellant.
 
 See Weber v. Aetna Casualty & Surety Co.,
 
 406 U.S. 164, 173, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972).
 

 To find the legitimate state interest which the legislature intended to further when it extended state funding for support services to indigent defendants represented by appointed counsel but not to those who enjoy the services of privately retained counsel, we need look no further than § 600.150.1, RSMo 1978. Subsection 1 of § 600.150, RSMo 1978, authorizes the trial court to allow the claim of an appointed counsel for reimbursement of expenses, and to fix a reasonable fee for the services of such counsel, “taking into account the nature of the case, the time spent in giving the representation, the time at which such representation began, and its duration.” The claim for compensation for services must be supported by a written statement of the appointed counsel, specifying the time expended and services rendered.
 
 Id.
 
 It is only when counsel is appointed, and his compensation is fixed by the court in accordance with § 600.150.1, RSMo 1978, that the legislature authorizes the court to advance funds necessary to obtain “other services required for an adequate representation.” § 600.150.2, RSMo 1978. If privately retained counsel could secure similar state funding without submitting the matter of his or her fee for the court’s determination, the amount of the attorney’s fee might well be the cause of the defendant’s inability to pay for support services without public funds. The evident state interest in so classifying indigents is the interest in
 
 *505
 
 conserving public resources so they will be available to those who are unable both to pay a reasonable attorney’s fee as fixed by the court and to finance other necessary services. The legislature rationally could have concluded that such support services should be provided at public expense only when the attorney is not free to exact a fee unlimited by the standards of § 600.150.1, RSMo 1978. The classification appellant challenges, therefore, bears a reasonable relation to a legitimate state interest, and satisfies the requirements of the equal protection clause. Appellant’s attorney at trial did not supply the trial court with a statement, oral or written, of the time he expended and the services he rendered on behalf appellant, and the court did not fix the amount of compensation which appellant’s attorney received. The court thus has no assurance that appellant’s privately retained counsel has not received, from funds that otherwise would have been available to bear the expense of pretrial depositions, a fee in excess of that which the trial court would have fixed under the standards provided in § 600.150.1, RSMo 1978.
 

 
 *490
 
 If any negotiable instrument payable or endorsed to a fiduciary as such is endorsed by the fiduciary, or if any negotiable instrument payable or endorsed to his principal is endorsed by a fiduciary empowered to endorse
 
 *491
 
 such instrument on behalf of his principal, the endorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in endorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in transferring the instrument.
 

 
 *505
 
 Appellant suggests that the distinction drawn by the trial court and by § 600.150.2, RSMo 1978 should be rejected because it would deter attorneys who may want to volunteer their services and time to indigents accused of crime from so volunteering, because such an attorney would realize that his indigent client would be denied free investigative and discovery assistance thereby. We recognize that our ethical considerations recommend that “[ejvery lawyer should support all proper efforts” to meet the need for legal services of those unable to pay reasonable fees EC 2-25, Rule 4. Appellant’s counsel admitted in oral argument before this Court that he was paid a fee — although appellant “did not pay [his attorney] a quarter, some of his friends did raise a little money.”
 
 [5]
 
 If appellant’s attorney truly were to assume the mantle of volunteer, the “little money” that was raised by appellant’s friends would have been used to obtain the depositions requested. Our opinion today in no way decides whether the denial of public funding for support services to an indigent criminal defendant who is represented by an attorney who volunteers his services violates equal protection of the law.
 

 Both the alleged due process violation and the alleged equal protection violation warrant reversal only if the appellant establishes by clear and convincing evidence that “the denial or restriction of investigative funds has substantially prejudiced the defendant at the state court trial.”
 
 Mason v. Arizona,
 
 504 F.2d 1345, 1352, 1355 (9th Cir. 1974),
 
 cert. denied
 
 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975);
 
 State v. McCormick,
 
 426 S.W.2d 62, 64 (Mo.1968)
 
 cert. denied
 
 394 U.S. 930, 89 S.Ct. 1199, 22 L.Ed.2d 460;
 
 State v. Pride,
 
 567 S.W.2d 426, 429 (Mo.App.1978).
 
 See Hoback v. State of Alabama,
 
 607 F.2d 680, 683 (5th Cir. 1979);
 
 State v. Knapp,
 
 114 Ariz. 531, 540, 562 P.2d 704, 713 (1977);
 
 State v. Nelson,
 
 279 N.W.2d 1, 3 (Iowa 1979);
 
 State v. Lee, 221
 
 Kan. 109, 115, 558 P.2d 1096, 1101 (1976). Appellant’s argument that the denial of state funding for depositions
 
 [6]
 
 prejudiced him at trial consists of the following:
 

 In retrospect, this Court can recognize and realize that the testimony of all of the witnesses whom defense counsel sought to depose, was extremely crucial to the State’s presentation of their case in chief. We suggest that this Court can also recognize that these witnesses gave
 
 *506
 
 conflicting testimony; and counsel now suggests to this Court that his cross-examination of these witnesses could have been made more effective had the confusion and material discrepancies and differences in their trial testimony been enhanced by their testimony during pre-trial depositions.
 
 [7]
 

 Appellant’s suggestion that depositions would have enhanced inconsistencies in the witnesses’ testimony may be seen as pure speculation — one might just as well suppose that the accounts given by these witnesses in depositions would have been completely consistent with one another and with the witnesses’ in-court testimony. Moreover, appellant does not point to any particular inconsistency in the testimony of any witness. In oral argument, appellant’s counsel suggested that the testimony of Deborah Harris was not credible, because she testified that she saw the shooting at a time when she had been pushed to the floor while holding her infant son, and when three people stood between her and appellant. Appellant’s attorney cross-examined Deborah Harris through 27 pages of the transcript, asking more than 225 questions. Appellant’s attorney cross-examined Audrey Thomas through 31 pages of the transcript, and cross-examined Cadaryl Cobbs through another 14 pages of the transcript. Although closing arguments were omitted from the transcript, we cannot presume that appellant’s attorney failed to attack the credibility of the state’s witnesses and their account of the shooting incident in closing argument as energetically and thoroughly as he cross-examined those witnesses.
 

 Appellant has only alleged generally that the trial court’s failure to grant his motion to take depositions prejudiced his preparation for trial.
 
 State v. Pride,
 
 567 S.W.2d 426, 429 (Mo.App.1978). In such circumstances, considering the record as a whole, we conclude that appellant has not shown, by clear and convincing evidence, that he was substantially prejudiced by the denial of state-financed depositions. Accordingly, neither the due process clause, nor the equal protection clause, mandates reversal of appellant’s conviction.
 
 Mason v. Arizona,
 
 504 F.2d 134, 1342, 1355 (9th Cir. 1974),
 
 cert. denied,
 
 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975). See
 
 State v. Knapp,
 
 114 Ariz. 531, 540, 562 P.2d 704, 713 (1977);
 
 State v. Nelson,
 
 279 N.W.2d 1, 3 (Iowa 1979);
 
 State v. Lee,
 
 221 Kan. 109, 115, 558 P.2d 1096, 1101 (1976).
 

 For the foregoing reasons, we affirm the judgment of the trial court.
 

 All concur.
 

 [1]
 

 . In fact, Deborah, Cadaryl and Rickey had been involved in the window-breaking incident. During January of 1975, Deborah had roomed with June and Judy Turner, and had abruptly moved out about a week before the shooting incident, leaving her clothing and other possessions. Three or four hours prior to the shooting, Cadaryl, Rickey, Deborah, Deborah’s sister Eleanor Wallace, a man named Angelo, and a woman named Marsha, all drove to the Turner home in an attempt to recover Deborah’s clothing. Cadaryl was not permitted to take Deborah’s clothes from the Turner house. While the carload of people with Deborah drove around the corner and stopped, Angelo stayed behind and threw a brick through the window of the Turner house.
 

 [2]
 

 . Appellant sought to depose, at state expense, the following persons: Deborah Harris, Audrey Wallace, Cadaryl Cobbs, Mildred Wallace, Patrolman Gerald Behrman, Patrolman Michael Roe, Detective Robert Froelich, Detective Sam Brooks, Detective Henry Harris, Patrolman Michael Pertol, Arthur Wallace, and Eleanor Wallace.
 

 [3]
 

 . The motion to take depositions in forma pau-peris was overruled and judgment rendered before the opinion in
 
 State v. Pride,
 
 567 S.W.2d 426 (Mo.App.1978) was handed down.
 
 Pride
 
 requested that trial courts include brief findings and reasons for rulings on future motions pursuant to § 600.150.2, RSMo, in order to facilitate appellate review. 567 S.W.2d at 429 n.l.
 

 [4]
 

 . Section 600.150, RSMo 1978 provides:
 

 1. Counsel, other than a public defender, appointed by a court in any circuit to represent an indigent person shall, at the conclusion of the representation, or any part thereof, be reimbursed for actual expenses reasonably incurred for investigative, mental and physical examinations, expert or other serv
 
 *504
 
 ices necessary in the representation or defense of the person. A claim for reimbursement shall be made to the court, where the case is or was tried or heard. The claim shall be supported by a written statement of the attorney or attorneys. The court may allow the claim for reimbursement of expenses and the court shall, in addition, fix a reasonable fee for the services of counsel to be paid to such counsel for the representation, taking into account the nature of the case, the time spent in giving the representation, the time at which such representation began, and its duration. Both the reimbursement of expenses and the attorney’s fee for services shall be paid by the state from funds appropriated for that purpose. The claim for compensation for services rendered shall be supported by a written statement specifying the time expended and services rendered. The court shall, in each instance, fix the compensation and reimbursement to be paid to the attorney or attorneys.
 

 2. Any counsel appointed under the provision of this section may request an advance of funds necessary to obtain investigative, expert or other services required for an adequate representation, in an ex parte application. Upon a finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the indigent person is financially unable to obtain them, the court shall authorize the immediate advancement of such funds to counsel to obtain such services on behalf of the person. The court may, in the interests of justice and upon a finding that timely procurement of necessary services could not await prior authorization, approve the cost of such services after they have been obtained.
 

 An amendment to § 600.150 enacted in 1976, substituted the word “court” in the second sentence of § 600.150.1, Laws of Mo. 1976, p. 790, in place of the words "circuit judge,” which appeared in the statute as originally passed, Laws of Mo. 1972, p. 1039.
 

 [5]
 

 . It has been held that the fact that the family and friends of a defendant “employed counsel for him or gave him money would be relevant to whether he could afford to obtain investigative services,” and would be one of several factors that a court would consider in determining his financial ability.
 
 Anderson v. Justice Court of San Benito County,
 
 99 Cal.App.3d 398, 160 Cal.Rptr. 274, 277 (1979). Under our statutes, a person is found to be indigent for purposes of appointment of counsel “when it appears from all the circumstances of the case that the person does not have the means at his disposal or available to him to obtain counsel in his behalf.” § 600.086, RSMo 1978.
 

 [6]
 

 . We observe that appellant made no attempt to show how the refusal to grant his alternative motion for an order summoning five witnesses to a tape-recorded interview in the office of the state’s attorney could have prejudiced him at trial, or interfered with his cross-examination
 
 *506
 
 of those witnesses. Allegations of error based on the trial court’s overruling of the alternative motion therefore must be overruled.
 

 [7]
 

 . Appellant’s own witnesses testified that appellant was present at the scene of the fatal shooting at the relevant time, that appellant argued with the victim, and that appellant fled immediately after the shooting. Appellant’s witnesses presented a view of the shooting which made appellant’s conduct appear justifiable, and appellant submitted a justifiable homicide instruction, MAI-Cr. 2.40. Appellant’s counsel characterizes the trial as a swearing contest between the state’s witnesses and appellant’s witnesses.